## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

DAYNA GLADSTEIN

       v.                                 C.A. No. 14-390-ML

LINCOLN FINANCIAL GROUP a/k/a
LINCOLN NATIONAL CORPORATION

### MEMORANDUM AND ORDER

The plaintiff, Dayna Gladstein ("Gladstein"), seeks payment of what she alleges are past due benefits under a long term disability insurance policy issued by the defendant, Lincoln Financial Group[1] ("Lincoln"), to Gladstein's former employer. Gladstein's claims are based on the contentions that (1) a $90,000 payment Gladstein made to Lincoln for reimbursement related to her receipt of social security disability ("SSDI") benefits was in full satisfaction of Lincoln's demand for $177,353 in overpayments; and (2) any SSDI benefits awarded to Gladstein's daughter as a result of Gladstein's disability are excluded from Gladstein's repayment obligations. On

---

[1] Lincoln Financial Group is a trade name of The Lincoln National Life Insurance Company. Answer ¶2 (Dkt. No. 3). Lincoln is the successor-in-interest to Jefferson Pilot Life Insurance Company, which issued the policy at issue in this case. Id. The Court notes that the Policy was issued by Lincoln's predecessor, which merged into Lincoln. For ease of reading, the Memorandum and Order will refer only to Lincoln, which is the party of interest in this case.

its part, Lincoln seeks repayment of approximately $29,376[2] for allegedly overpaid benefits, as well as attorneys' fees it has expended in an effort to recoup the overpayment. The matter is before the Court on the parties' cross-motions for summary judgment.

## I. Factual Background

The summary of the factual underpinnings of this case are based on the submissions of the parties in support of their respective motions for summary judgment. The Court notes that Gladstein submitted a Statement of Undisputed Facts ("PSUF") (Dkt. No. 23-2, an Additional Statement of Undisputed Facts ("PSUF2")(Dkt. No. 35-1), a Statement of Disputed Facts ("PSDF")(Dkt. Nos. 27-2, 31), and a Statement of Additional Disputed Facts ("PSDF2")(Dkt. No. 35-2). On its part, Lincoln submitted a Statement of Undisputed Facts ("DSUF")(Dkt. No. 22-2), a Statement of Additional Undisputed Facts ("DSUF2")(Dkt. No. 30), and a Statement of Disputed Facts ("DSDF")(Dkt. No. 29). In addition, Lincoln submitted two large binders with the redacted version of the administrative record (the "Administrative Record"

---

[2]

The amount reflects Lincoln's original overpayment figure reduced by the sum of Gladstein's $90,000 repayment, plus $52,128 in benefit offsets, *i.e.* reduced payments Lincoln made to Gladstein following the award of SSDI benefits, plus an $856 overestimate of such benefits by Lincoln, and $6,000 in attorney's fees allowed to Gladstein's counsel. Affidavit of Jason Schiebel ¶17 (Dkt. No. 28-3).

or "AR")[3], together with a CD containing the same. Docket Entry 05/07/15. The Administrative Record appears to consist of Gladstein's entire claim file, including, *inter alia*, Gladstein's voluminous medical record from the time she first made an application for disability benefits; copies of the extensive correspondence between the parties; documents relating to determinations made by the Social Security Administration; and various schedules regarding payments Lincoln made to Gladstein. For the most part, the details of Gladstein's disability are not relevant in this case and the Court will limit its summary of facts accordingly, leaving out any unsupported allegations, disputes over factual details that have no impact on the Court's analysis, or any arguments made in support of the parties' respective positions.

The following facts are undisputed by either party: in November 2005, at the time Gladstein first applied for disability benefits, she was employed by Child and Family Services of Newport County ("CFS"), to which Lincoln had issued a group long term disability ("LTD") insurance policy (the "Policy")(Dkt. No. 22-3). DSUF ¶1. The Policy is governed by ERISA;[4] it is a  partially

---

[3]

The Administrative Record consists of 1844 Bates-stamped pages of various categories of documents without the benefit of a content section or an index.

[4]

Although Gladstein's LTD claim profile contains the notation: "Group is Non-ERISA," see AR at 1, that statement appears to be in error. Gladstein does not contest Lincoln's assertion that the Policy is governed by ERISA. See PSDF (no disagreements with DSUF

funded CFS's employee welfare benefit plan as defined by ERISA. DSUF ¶¶ 2, 3. The Policy's benefit percentage is set at 60% of Gladstein's basic monthly earnings, with a maximum monthly benefit of $6,000. AR 2. Under the Policy, Lincoln has, unless otherwise specified, broad discretionary authority concerning Policy management, administration, interpretation, and dispute resolution. Policy at 9, 13[5].

The following provisions in the Policy are critical to the issues in this case:

> **TOTAL DISABILITY MONTHLY BENEFIT**
> The amount of the Total Disability Monthly Benefit [to be paid by Lincoln to an insured employee who is totally or partially disabled] equals:
> 1. the Insured Employee's Basic Monthly Earnings multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); **minus**
> 2. Other Income Benefits.  Policy at 17, DSUF ¶6. (Emphasis added).

Other Income Benefits are defined in the Policy to include

> "Benefits under the United States Social Security Act ... or any similar plan or act as follows:
> (a) disability or unreduced retirement benefits for which the Insured Employee **and any spouse or child is eligible, because of the Insured Employee's Disability** or eligibility for unreduced retirement benefits;... Policy at 20. (Emphasis added)  DSUF ¶¶ 7, 8.

---

¶¶1-5).

[5]   Consistent with the parties' submissions, the Court will refer to the exhibit page numbers of the Policy, not the policy page numbers.

Although Gladstein agrees that "this is what is stated in policy [sic]," she disagrees that "the policy in the matter at hand is correct," citing case law for the proposition that social security benefits paid to minors are not subject to offset against LTD benefits. PSDF ¶¶6-8.

The Policy further provides that, if the insured is

"entitled to payment or reimbursement from some other person or organization, through a legal action or claim, which is due to the same or related Disability for which Policy benefits are payable,"

Lincoln has the right to a lien on any recovery from that person or organization for

1. the amount actually recovered for such Disability, less reasonable legal fees and expenses the Insured Employee paid to pursue the recovery; or 2. The total amount of Policy benefits paid for the Disability; whichever is less. Policy at 12; DSUF ¶9.

In the case of overpayment of Policy benefits, full reimbursement to Lincoln is required within sixty days. Policy at 12; DSUF ¶10. If timely reimbursement is not made, Lincoln has the right to "1. reduce future benefits until full reimbursement is made; and 2. recover such overpayments from the Insured Employee or his or her estate." Policy at 12. The Policy further specifies that [s]uch reimbursement is required whether the overpayment is due to error in processing, "the Insured Employee's receipt of Other Income Benefits," or fraud or any other reason. Policy at 12; DSUF ¶10.

5

Gladstein first applied for benefits under the Policy effective[6] November 29, 2005. AR 1352; DSUF ¶11. Initially, Lincoln denied the claim and Gladstein appealed. On April 5, 2007, Lincoln awarded benefits to Gladstein. AR 1197; DSUF ¶12. In order to receive the benefits awarded to her, Gladstein was required to fill out a "Disability Payment Options" form, which informed her that "Disability benefits will be reduced by the amount of Social Security Benefits which you and your spouse and family are eligible to receive." AR 1185 (underline in original). Because the Social Security Administration had not yet made a decision regarding Gladstein's benefits, Lincoln provided Gladstein with two options in receiving benefits under the Policy: (1) she could receive monthly benefits reduced by what Lincoln estimated her SSDI benefits to be, or (2) she could receive an unreduced monthly benefit subject to repayment for any overpaid amounts and subsequent reduction of any future benefits. AR 1185; DSUF ¶13. It is undisputed that Gladstein elected the second option, acknowledging that if she did not make a timely repayment of any overpayment, Lincoln was entitled to "offset the amount of the overpayment against any current or future benefits payable to [her]... and take any other actions necessary to recover the

_____

[6]

According to the Administrative Record, Gladstein stopped working on June 2, 2005, which set the potential benefit start date for November 29, 2005, following a 180-day elimination period. AR 1352.

6

overpayment." AR 1186; DSUF ¶14,15.

By letter dated November 7, 2011, Lincoln informed Gladstein that it had reviewed her Long Term Disability claim and had determined that no benefits were payable beyond November 28, 2011. AR 354; DSUF ¶17. According to Lincoln's notification, "the medical documentation contained in [Gladstein's] claim file does not support Total Disability as defined by this Policy." AR 357; DSUF ¶17. Although Gladstein disagrees with Lincoln's statement that there was "a lack of medical documentation to support total disability pursuant to the Policy," DSUF ¶17, PSDF ¶17, the Court notes that Lincoln's determination regarding Gladstein's disability status is not at issue in this case. Accordingly, a dispute regarding the underlying validity of Lincoln's determination as to Gladstein's status is insufficient to preclude an adjudication of the parties' claims at summary judgment.

Gladstein does not disagree that, as of the date Lincoln terminated her benefits, she had received $275,966.61 in LTD benefits from Lincoln. AR 333; DSUF ¶ 18. Gladstein appealed the termination of her benefits on May 11, 2012[7]. AR 317; DSUF ¶ 19. At the same time, Lincoln and Gladstein corresponded regarding the benefit overpayment caused by Gladstein's receipt of her SSDI

---

[7] Although Lincoln asserts that the appeal was commenced on May 29, 2012, the Administrative Record reflects that Lincoln acknowledged receiving the appeal on May 11, 2012. Letter dated May 16, 2012 from Lincoln to Gladstein's counsel. AR 317.

award. DSUF ¶20. According to the Administrative Record, on September 6, 2005, the Social Security Administration acknowledged receipt of Gladstein's August 26, 2005 application for SSDI benefits. AR 391, 1180. (As Gladstein correctly points out, Lincoln's statement that she applied for SSDI benefits after Lincoln approved her claim, see DSUF ¶21, PSDF ¶21, appears to be in error. However, the timing of the application is not relevant to the claims of either party.)

On September 12, 2011, an Administrative Law Judge determined that Gladstein had been disabled under sections 216(I) and 223(d) of the Social Security Act since June 24, 2005. AR 391. The response to a query submitted by Lincoln to the Social Security Administration ("SSA") reflects a past due SSDI benefits award of $190,588 ($129,684 to Gladstein as Payee and $60,904 to Gladstein as Payee for M.C., her daughter[8].) The parties differ on what lump sum payment Gladstein received for SSDI once her disability had been determined. According to Lincoln, Gladstein received a lump-sum benefit of $190,588, of which $183,353 represented benefits for the same time period during which Lincoln paid her $275,966 in Policy benefits. DSUF ¶¶ 24, 25. In support of that

---

[8]

The record reflects that Gladstein's daughter M.C. was twelve years old when Gladstein first applied for disability benefits and that M.C. was was eighteen years old when Gladstein's SSDI benefits were approved and retroactive payment was made. Ex. 2 to Schiebel Aff. (Dkt. No. 28-5); AR 389; Gladstein Aff. ¶15.

contention, Lincoln references AR 0334, which appears to be an enlargement of the SSA query, that is only partially legible (compare AR 334 to Dkt. No. 28-5). Although that document states that Gladstein's total family benefits are set at $2630.80 per month and that past benefits due are $190,588, the amount of the lump sum payment received by Gladstein cannot be gleaned from that portion of the record. On her part, Gladstein denies receiving a lump sum benefit of $190,588, asserting instead that she received a total amount of $163,702, of which her dependent received $60,904. PSDF ¶¶24,25.

The correspondence from Lincoln to Gladstein regarding her disability claims reflects that Lincoln reiterated on numerous occasions that any payments made to Gladstein under the Policy were subject to offset by any SSDI benefits she might receive. See AR 1197 (April 5, 2007 Lincoln letter, informing Gladstein that she qualified for disability benefits); AR 1195 (April 9, 2007 Lincoln letter, requesting Gladstein to apply for SSDI benefits); AR 1189 (April 10, 2007 Lincoln letter, advising Gladstein's attorney that Gladstein was awarded LTD benefits under the Policy and stating that "benefits for which Mrs. Gladstein or her dependents may qualify, offset the monthly [LDS] benefit" set at $3,925." (Emphasis added); AR 673 (December 22, 2008 Lincoln letter reminding Gladstein to provide Lincoln with the current status of her SSDI application. The letter also notifies Gladstein that, if the

information is not received by January 12, 2009, Lincoln may estimate her SSDI award and offset the LTD benefits or suspend future benefits until the information has been received); AR 592 (July 21, 2010 Lincoln letter, informing Gladstein that, because she had not provided information regarding her SSDI application status, Lincoln estimated her SSDI benefits at $2,181 per month, reducing her monthly benefit to $1,744); AR 459 (October 4, 2011 Lincoln letter, acknowledging that Gladstein had been awarded SSDI benefits, noting that, if such benefits had been awarded retroactively, she would have incurred an overpayment of Policy benefits, and encouraging her to retain any SSDI lump sum until the overpayment could be calculated); AR 400 (October 17, 2011 Lincoln letter, advising Gladstein that, in the absence of an SSA award letter Lincoln had requested, Lincoln would estimate her monthly SSDI benefits to be $2,181 for Gladstein and $1,090 for her dependent. Lincoln offset the entire amount, reducing Gladstein's future monthly benefit payments to $654); AR 399 (October 25, 2011 Lincoln letter, informing Gladstein that it would offset an estimated SSDI benefit of $2,181, reducing her future monthly payments to $1,744[9]). Although Gladstein suggests that "most letters related to future payments and not reimbursement

---

[9]

The change appears to reflect that Lincoln had been informed by Gladstein that her daughter was no longer eligible for SSDI benefits because she had reached maturity.

obligations," see PSDF ¶22, it is undisputable that Gladstein was repeatedly informed by Lincoln that any SSDI payments she and/or her family received would be offset from her LTD benefits and that she was obligated to repay any overpayment to Lincoln.

By letter dated January 9, 2012, Lincoln notified Gladstein that it had received notification of her SSDI award and that, due to such award, the LTD claim had been overpaid by $177,353. AR 332; DSUF ¶26. Lincoln requested a check for $177,353 within 30 days. Attached to the letter is a spreadsheet that reflects (1) Lincoln's LTD payments to Gladstein between November 29, 2005 and November 29, 2011, totaling $275,966 (uncontested by Gladstein), and (2) the amount of LTD benefits Lincoln asserts were actually due to Gladstein, calculated by subtracting $2,629 in monthly SSDI benefits from $3,925 in LTD benefits paid, and totaling $92,612. Lincoln further reduced the calculated overpayment total of $183,353[10] by subtracting $6,000 in attorney's fees to Gladstein's counsel for successfully obtaining SSDI benefits for his client.[11] AR 333.

By letter dated December 15, 2011, Gladstein's counsel, on his

---

[10]

Although Lincoln alleges that Gladstein received a $190,588 lump sum payment of SSDI benefits, it further asserts that only $183,353 represented SSDI benefits awarded for the period she also received $275,966 in Policy benefits from Lincoln. DSUF ¶25.

[11]

As is evident from the correspondence between Lincoln, Gladstein, and her counsel, that Gladstein is being represented by her husband, who is an attorney.

client's behalf, send a check to Lincoln "to fully reimburse Lincoln Financial for money it has paid to Ms. Gladstein." DSUF ¶27. Gladstein's counsel also stated, without further explanation, that he had "deducted money that was owed to my client and for attorney's fees as per Costa v. Pawtucket Mutual Insurance Company.[12]" AR 330; DSUF ¶29. The $90,000 check Gladstein's counsel sent to Lincoln includes a notation that it is intended for "Full + final payment owed as reimbursement for benefits paid to Dayna Gladstein." AR 107; DSUF ¶28.

In later correspondence Gladstein's counsel sent to Lincoln, he asserts that he arrived at what he considered full repayment by subtracting a fee of $12,798[13] from $102,798, the SSDI lump sum benefits Gladstein admits to receiving. AR 103. A Social Security Benefit Statement ("SSA-1099") sent to Gladstein reflects net benefits for 2011 of $115,144.20, comprised of (1) payment by check or direct deposit of $102,798, (2) Medicare Part B premium of $346, and (3) attorney fees of $12,000. AR 105. A second SSA-1099 sent to "Gladstein for M.C." reflects net benefits of $60,904, comprised

---

[12]

Costa v. Pawtucket Mutual Ins. Co., 688 A.2d 1286 (R.I. 1997)(reimbursement to insurance company for medical payments coverage under policy reduced by insured's attorney fees, on the ground that insurer benefitted from attorney's legal efforts on the insured's behalf).

[13]

Gladstein's counsel states that, pursuant to Costa v. Pawtucket Mut. Ins. Co, he was actually entitled to a 25% attorney fee, but he had reduced his fee to about half the amount. Costa offers no support for that contention.

of (1) payment by check or direct deposit of $45,678, and (2) attorney fees of $15,226. AR 106.

By letter dated January 10, 2012, Lincoln informed Gladstein that it had received a check for $90,000 and that, after applying the amount to the remaining overpayment, the balance to be repaid was $87,353. AR 331; DSUF ¶32. On February 13, 2012, Lincoln sent a second letter to Gladstein, again acknowledging that it had received the $90,000 check, and demanding payment of the outstanding overpayment of $87,353 within thirty days. AR 329; DSUF 32.

According to Gladstein's LTD claim profile, which sets forth in some detail any significant events and decisions related to the claim, as well as any attempted and effected communications between the parties, Lincoln informed Gladstein on March 28, 2013 that she was eligible to receive disability benefits for chronic fatigue syndrome. AR 2, 69. Because coverage for this condition was limited under the Policy to 24 months—a limitation which Gladstein does not challenge—Gladstein was eligible for coverage between November 29, 2011 through November 29, 2013. AR 2, 68. Although Lincoln initially asserted that the gross benefits for that period totaled $47,806, see DSUF 34, Affidavit of Cindy Daly at ¶12 (Dkt. No. 22-4), it appears that Lincoln actually agrees with Gladstein's contention that the gross benefits totaled $52,689 (monthly gross LTD benefits of $3,925 reduced by $1,753 in SSDI benefits equal

13

net LTD benefits of $2,172, <u>multiplied</u> by 24). <u>See</u> PSDF ¶34, Schiebel Aff. ¶16.   It is undisputed that Lincoln did not pay either amount to Gladstein for the November 29, 2011 through November 29, 2013 period; rather, Lincoln applied $38,269 of those benefits to the overpayment balance of $87,353, and issued a check of $9,356, which represented the 24 months of the minimum payment required under the Policy (10% of the monthly benefit). DSUF ¶35. On June 14, 2013, Gladstein's counsel returned the $9,356 check to Lincoln, together with a lengthy explanation of the reasons for the return. Gladstein's counsel claimed that Gladstein was owed $45,075 plus ongoing monthly payments, and that she would accept nothing less. More specifically, Gladstein's counsel explained that (1) Gladstein only received a lumpsum of $102,798 in SSDI benefits and the $90,000 check she sent to Lincoln for reimbursement reflected reduction of that amount by her counsel's discounted attorney's fee;[14] (2) Gladstein never received any SSDI payments awarded on behalf of her daughter; (3) under Rhode Island law, Lincoln's acceptance of the $90,000 reimbursement check constituted full

---

[14]
    It is noted that, although Lincoln contends that the Policy has no provision for attorney fees, the Policy provides that any lien Lincoln may place on payment or reimbursement to which the insured may be entitled from third parties is reduced by "reasonable legal fees and expenses the Insured Employee paid to pursue the recovery." AR 12.
    In addition, the two SSA-1099 forms reflect attorney's fees totaling $27,226 as benefits to Gladstein (on her own behalf and that of her daughter).

14

satisfaction of all sums owed; and (4) Gladstein was not bound by language on the Lincoln check/check stub referencing "Final Benefits" and "Benefit Period from 11/25/11 to 11/29/13." AR 103-104.

Lincoln applied the $9,536 returned check to the outstanding overpayment balance. AR 2, Daly Affidavit ¶18. At this point, Lincoln asserts that it is owed an outstanding overpayment balance of $29,376, whereas Gladstein deems any balance due on the overpayment to have been paid and she asserts that she is owed $52,689 in LTD benefits plus interest. Notwithstanding the parties' disagreement about the exact amounts due and certain inconsistencies in both their calculations,[15] the issues that are ripe for a decision on summary judgment are the following:

(1) Did Gladstein's $90,000 payment to Lincoln constitute full payment of all amounts she owed for LTD benefits overpayment under the Policy?

(2) Is Lincoln entitled to recover from Gladstein an offset for any SSDI benefits that were awarded to her daughter as a result

---

[15]

For example, Lincoln claims an outstanding LTD benefit overpayment balance of both $39,547 (DSUF ¶37, Daly Aff.) and $29,376 (Schiebel Aff.) On her part, Gladstein claims to have received only an SSDI lump sum payment of $102,798, see PSDF ¶24, omitting from her calculation the Medicare Part B Premium and attorney's fees that were included into her net benefit, and asserting that her daughter received a lump sum payment of $60,904, see id., including therein the attorney fees that were part of the net benefit.

of Gladstein's disability?

(3) Did Lincoln have the right to reduce LTD benefit payments to Gladstein in order to recoup any overpayment for which Gladstein had not fully reimbursed Lincoln?

## II. Procedural History

On April 22, 2014, Gladstein brought a four-count complaint (the "Complaint") against Lincoln in Rhode Island district court, alleging breach of fiduciary duty (Count I), bad faith (Count II), breach of contract (Count III), and fraud and conversion (Count IV). (Dkt. No. 1-2). Gladstein, who acknowledges that, "[a]s part of the disability payments from Lincoln, [she] was required to pay back any money received from Social Security to Lincoln," Complaint ¶11, seeks payment of what she alleges to be "past due benefits owed for the time period of November[16] through May 2013 and for subsequent monthly payments."

Lincoln removed the case to this Court on September 2, 2014[17], asserting jurisdiction on the basis that Gladstein's state law based claims constitute a claim for benefits under a policy governed by ERISA, 29 U.S.C. §1001 *et seq.* (Dkt. No. 1-1). On September 9, 2014, Lincoln filed an answer to the Complaint and

---

[16]

Based on other asserted facts in her Complaint, this date reference relates to November 25, 2011. See Complaint ¶19.

[17]

Lincoln was not served with the Complaint until August 7, 2014. (Dkt. No. 1-2 at 2).

16

asserted a four-count counterclaim for Enforcement of Plan Provisions (Count I), Equitable Lien or Constructive Trust (Count II), Unjust Enrichment (Count III), and Attorneys' Fees (Count IV) to which Gladstein responded with an answer on October 3, 2015 (Dkt. No. 6).

On December 1, 2014, Gladstein filed a motion to amend the Complaint in order to revise or add facts and to include a class-action claim (Dkt. No 12), to which Lincoln filed a detailed objection (Dkt. No. 16). In her February 4, 2015 reply to Lincoln's objection, Gladstein noted that she had no objection to withdrawing her class action claims, and filing, instead, an amended complaint "devoid of any language as to said Class Action." (Dkt. No. 18). Following a Rule 16 conference on February 19, 2015, the parties were directed to file cross-motions for summary judgment on or before April 24, 2015. Following a grant of an extension of time, both parties submitted their motions on May 1, 2015.

On June 26, 2015, nearly two months after the parties had filed their initial summary judgment briefings and a month after they had submitted their respective objections, Gladstein filed a new motion to amend/correct the Complaint (Dkt. No. 36), to which Lincoln objected, in part (Dkt. No. 37), and in support of which Gladstein filed a reply (Dkt. No. 38-1). Gladstein offers no reason for her belated attempt to amend her complaint.

In light of the unexplained delay of Gladstein's attempt to

amend her Complaint until after the parties' cross-motions had been fully briefed and referred to this Court, and given the undeniable prejudice to Lincoln should Gladstein's request be granted, Gladstein's motion to amend her Complaint is denied. The Complaint filed on April 22, 2014 and removed to this Court on September 2, 2014 is the operative complaint in this case.

## III. Standards of Review

### A. Cross-Motions for Summary Judgment

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding a motion for summary judgment, the Court reviews the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir.1997).

In summary judgment, the burden shifts from the moving party, who must first aver "'an absence of evidence to support the nonmoving party's case,'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)), to the nonmoving party, who must present facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995); Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 581 (1st

18

Cir.1994)).

When both parties raise cross-motions for summary judgment, the basic Rule 56 standard is not altered. Rather, it requires the Court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Intern. Group., Inc. v. Ferre Development, Inc., 241 F.3d 103, 107 (1st Cir. 2001)(citing Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230(1st Cir. 1996)); Bienkowski v. Ne. Univ., 285 F.3d 138, 140 (1st Cir.2002)("'The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.' 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed.1998).").

**B. Challenge of Determinations under Employee Benefits Plan**

Although Gladstein has formulated her Complaint in terms of claims pursuant to Rhode Island state law, the primary basis of her claims is the assertion that Lincoln is refusing to pay her for certain past due benefits under the Policy. Secondly, Gladstein seeks a determination that repayment of $90,000 fulfilled her obligation under the Policy to reimburse Lincoln for any SSDI benefits she received for her disability and that any SSDI benefits awarded to her daughter are exempt from Gladstein's repayment obligations.

19

It is undisputed that the Policy was issued to Gladstein's former employer in order to provide her with the benefit of long term disability insurance. Moreover, it is evident from Gladstein's memoranda and PSDF that she concedes that ERISA is applicable in this case. Pursuant to 29 U.S.C. § 1002(1), the elements of an ERISA plan are (1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing ... benefits in the even of disability (5) to participants or their beneficiaries. Wickman v. Northwestern Mutual Life Insurance Company, 908 F.2d 1077, 1082 (1st Cir. 1990); 29 U.S.C. § 1002(1). 29 U.S.C. §1144 provides that ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. §1144.[18] Accordingly, Gladstein's state-law based claims, to the extent they relate to, and interfere with, the administration of an ERISA governed benefit plan, see Shaw v. Delta Air Lines, 463 U.S. 85, 90, 99, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), are preempted entirely by ERISA.

The First Circuit has recognized that, "in an ERISA benefit-denial context, 'the district court sits more as an appellate tribunal than as a trial court.'" Cusson v. Liberty Life

---

[18]

Section 1003(b) relates to several categories of plans, none of which are applicable in this case.

<u>Assur. Co. of Boston</u>, 592 F.3d 215, 223-224 (quoting <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 18 (1st Cir.2002)). "In such cases, 'summary judgment is simply a vehicle for deciding the issue,' and, consequently, 'the non-moving party is not entitled to the usual inferences in its favor.'" <u>Id.</u> (quoting <u>Orndorf v. Paul Revere Life Ins. Co.</u>, 404 F.3d 510, 517 (1st Cir.2005)).

When an ERISA-based benefit plan gives the administrator discretionary authority[19] to determine eligibility for benefits or to construe the terms of the plan, the Court is required to apply the deferential "arbitrary and capricious" standard of review. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Zarro v. Hasbro, Inc.</u>, 896 F.Supp.2d 134, 140 (D.R.I.2012). Under that "generous standard," the Court inquires into whether Lincoln's determinations were "reasoned and supported by substantial evidence." <u>Medina v. Metropolitan Live Ins. Co.</u>, 588 F.3d 41, 45 (1st Cir. 2009)(citing <u>Stamp v. Metropolitan Life Ins. Co.</u>, 531 F.3d 84, 88 (1st Cir. 2008)). Accordingly, as long as Lincoln's determinations rest on a reasonable basis, they will be upheld.

**IV.  The Parties' Positions**

Primarily, Gladstein asserts that Lincoln's acceptance of her

---

[19]

The discretionary language of the Lincoln Plan provides, in pertinent part, that "[e]xcept for the functions that the Policy clearly reserves to the Group Policyholder or Employer, the Company has the authority to: 1. manage the Policy and administer claims under it; and 2. interpret the provisions and resolve questions under the Policy." Policy at 13.

annotated $90,000 check fully satisfies her admitted obligation to repay any overpayment she incurred by receiving SSDI benefits. In support of the contention that she only owed that portion of the total amount Lincoln demanded as overpayment, Gladstein suggests that (1) SSDI benefits awarded to her daughter because of Gladstein's disability are not considered "Other Income"; and (2) because her daughter was of age and no longer residing in Gladstein's home when the retroactive SSDI benefits were received, Gladstein received no benefit from the lump sum payment made on behalf of her daughter. Gladstein also argues for prejudgment interest related to Lincoln's initial denial of her request for benefits; however, no claim for such interest is included in her Complaint. Finally, Gladstein asserts that her Complaint was not brought in bad faith and that an award of attorneys' fees to Lincoln is not indicated.

Lincoln asserts that, based on the plain language of the ERISA-governed Policy provisions, it was obligated (1) to offset Gladstein's SSDI income, and (2) to seek reimbursement for overpaid benefits. Lincoln argues that Gladstein's state law based claims are really claims for benefits under the Policy, which are preempted by ERISA; and that Lincoln is entitled to deference regarding its interpretation of the Policy language and related decisions. Accordingly, Lincoln argues, it was entitled to reduce LTD benefits to Gladstein in order to recoup the amounts she still

22

owed in overpayment, and Gladstein's partial payment was ineffective in fulfilling her entire repayment obligations. Regarding the SSDI benefits awarded to Gladstein on behalf of her daughter, Lincoln relies on the plain language of the Policy provision which includes such benefits as "Other Income" that must be offset against Gladstein's LTD benefit payments.

## V. Discussion

The Policy at issue here is an employee welfare benefits plan governed by ERISA, which, in its plain language, authorizes the insurer to (1) offset social security benefits payable to the insured and to his or her spouse and/or children; and (2) recover any overpayment resulting from lump sum payments of "Other Income" Benefits, such as SSDI payments. Gladstein, in fact, agrees with Lincoln's contention that "[a]s part of the disability payment from Lincoln, Gladstein was required to pay back any money received from Social Security to Lincoln." Complaint ¶11. Gladstein contends however, that (1) Lincoln's acceptance of Gladstein's $90,000 repayment freed her from any obligation to pay the rest of the overpayment; and (2) any sums awarded to her daughter because of Gladstein's disability were not subject to the same repayment provisions.

### A. The $90,000 Check

For the first part of her argument, Gladstein relies on R.I. Gen. Laws § 6A-3-311, which provides, in pertinent part, as

follows:

> (a) If a person against whom a claim is asserted proves that (i) that person <u>in good faith</u> tendered an instrument to the claimant as full satisfaction of the claim, ( ii) the amount of the claim was unliquidated or <u>subject to a bona fide dispute</u>, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

> (b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim. R.I. Gen. Laws § 6A-3-311. (Emphases added).

Based on that provision, Gladstein argues that Lincoln's acceptance of a repayment check that contained the notation "Full + final payment owed as reimbursement for benefits paid to Dayna Gladstein" operated to fulfill her obligation under the Policy to reimburse Lincoln for the offset from her SSDI benefits. Gladstein's claim fails on two accounts. First, determination of both Gladstein's and Lincoln's claims in this litigation requires a review and interpretation of a Policy that falls under ERISA regulations. Gladstein's $90,000 repayment was based on her contentions that (1) she was not required to repay any SSDI benefits awarded on behalf of her daughter, and (2) she was entitled to subtract attorney's fees from the overpayment amount. A determination of the merit of those contentions depends on an interpretation of the provisions in the Policy. To the extent Gladstein's payment practices—*i.e.* paying only a portion of the

24

requested overpayment and simply noting on the check that the
partial payment constituted payment in full—relies on R.I. Gen.
Laws 6A-3-311, application of that state statute is preempted by
ERISA. Accordingly, Section 6A-3-311 provides no defense to
Gladstein against Lincoln's claim for recoupment of all SSDI
benefit payments awarded to Gladstein and her family for the time
period for which she also received unreduced LTD benefit payments
from Lincoln.

**B.   SSDI Benefits Awarded to Dependent**

With respect to her second argument, Gladstein makes a number
of assertions as to the benefits that were awarded to her daughter,
only some of which are supported by the record. It is undisputed
that Gladstein's daughter was awarded SSDI benefits as a result of
Gladstein's disability status; there is no suggestion in the record
that Gladstein's daughter was awarded such benefits as a result of
her own status. It is likewise undisputed that, by the time
Gladstein was awarded SSDI benefits in 2011 and received a lump sum
retroactive payment of such benefits, her daughter had reached the
age of majority. However, Gladstein's contentions that her daughter
has not resided in Gladstein's household since 2008 and that
Gladstein did not receive the lump sum in dependent SSDI benefits
is unsupported by any documentation other than Gladstein's own

25

statements.[20] Gladstein Aff. ¶¶14, 15. The SSA query reflects that Gladstein was awarded $1,753 in monthly SSDI benefits for 2005, which amount was increased in subsequent years.[21] AR 335. The SSA query also shows that an additional sum of $876 in monthly dependent benefits was awarded to Gladstein's daughter, beginning in 2005.[22] This amount was also increased every year until the payments were terminated when Gladstein's daughter reached maturity.[23] The records show Gladstein, at her address, as the payee for both benefits, for herself and "for M.C." AR 335, 336. Regardless of how the SSDI benefits awarded to Gladstein's

---

[20]
No information has been provided as to where the daughter lived, or whether the receipt of SSDI benefits awarded to her had any impact on support payments for which Gladstein may have been responsible.

[21]
As Lincoln acknowledges, the SSDI benefit offset is based only on the amount of the initial SSDI award and does not take any subsequent increases into consideration. The Policy provides that "[a]fter the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost-of-living increases payable under these Other Income Benefits. Policy at 20. Gladstein was informed accordingly. AR 1195.

[22]
The response to the query specifies Gladstein as the "Payee" "for M.C." at Gladstein's address, updated as of November 9, 2011. AR 336.

[23]
As Lincoln points out, Gladstein has not offered any evidence to support her statement that the SSDI benefit payments on behalf of her daughter ceased in May 2011. However, based on Gladstein's affidavit, Lincoln has accepted that representation and has reduced the outstanding repayment amount accordingly, accounting for some of the changing calculations of the final outstanding amount in this case.

dependent were eventually distributed or utilized, the Policy is explicit that the total disability monthly benefit Lincoln will pay to an insured employee will be reduced by any disability benefits "for which the Insured Employee and any spouse or child <u>is eligible</u>, because of the Insured Employee's Disability" under the United States Social Security Act. Policy at 20 (emphasis added) In the absence of any evidence in the record, or even a suggestion by Gladstein, that the SSDI benefits awarded to her daughter were awarded for any other reason independent of Gladstein's disability, the Court concludes that those benefits were properly used to calculate the offset against Gladstein's LTD benefits.

The two cases on which Gladstein relies, neither of which constitute controlling precedent for this Court, do not call for a different conclusion. <u>Carstens v. U.S. Shoe Corporation's Long-Term Benefits Disability Plan</u>, 520 F.Supp. 2d 1165 (N.D. Cal. Oct. 31, 2007) is distinguishable from the instant case, although not for the reason suggested by Lincoln.[24]  The Policy language in <u>Carstens</u> provided for an offset for "[p]eriodic benefits, for loss of time on account of the Employee's disability, under or by reason of...the United States Social Security Act..., exclusive of

---

[24]  Lincoln suggests that in <u>Carstens</u>, SSDI benefits awarded to an adopted child based on his natural mother's disability were used to offset the LTD benefits awarded to his adoptive mother for her own disability. That assertion is not supported by the district court's order.

27

benefits paid to a former spouse of the Employee or to a child of the Employee." The district court, making note of the ambiguity of the policy language, found that the SSDI benefits received by the adopted child of the insured were not "replacement for his mother's 'loss of time,' and therefore should not be offset under the [insurer's] Plan." Carstens at 1167. By contrast, the language in the Lincoln Policy expressly states that "disability...benefits for which the Insured Employee and any spouse or child is eligible, because of the Employee Insured's Disability" are subject to an offset. Policy at 20.

In Unisys Corp. Long-Term Disability Plan ERISA Litigation, the Third Circuit emphasized that language in a benefits plan must be specific as to which benefits are to be considered in the offset provision. Unisys Corp. Long-Term Disability Plan ERISA Litigation, 97 F.3d 710, 715 (3d Cir. 1996). In Unisys, the language of the benefits plan at issue had been changed and no longer provided for a deduction of SSDI benefits to dependents. Unlike an earlier version, which included into the offset "disability benefits for which...you are eligible, and ...your spouse, child or children are eligible because of your disability," Unisys at 712, the new plan merely addressed "income from other sources," without specifying disability benefits received by eligible family members. The Third Circuit concluded that the omission of a reference to benefits by family members was unambiguous and that such benefits were not to

28

be included in the offset. Id. at 717.

In the instant case, the language of the Policy is unambiguous with respect to the extent of the offset. It is undisputed that Gladstein's daughter was eligible for SSDI benefit because of Gladstein's disability and not for another, independent reason. Based on the explicit provision in the Policy that includes dependent SSDI into the calculation, the amounts awarded to Gladstein's daughter are subject to the offset and to repayment.

To summarize, this is not a case in which a denial of benefits by the insurer is challenged by the insured employee. It is undisputed that Lincoln awarded more than $325,000 in LTD benefits to Gladstein, of which $275,966 were paid to her, at her election, in unreduced amounts. An additional sum of $52,128 in LTD benefits was credited against the overpayment that, under the unequivocal terms of the Policy, Gladstein was obligated, but failed, to repay after being awarded more than $190,588 in retroactive SSDI benefits. Instead, the case stems from Gladstein's contention that (1) a partial payment by annotated check absolved her of any further reimbursement obligations; (2) any LTD benefits awarded to her daughter did not constitute "other income" subject to a benefit setoff; and (3) based on the foregoing, Gladstein was entitled to receive continued unreduced payments of LTD benefits instead of the Policy's minimum amount offered to her by Lincoln.  Because the undisputed facts of this case and the plain language of the Policy

demand otherwise, Gladstein's motion for summary judgment cannot withstand Lincoln's counter motion.

## Conclusion

For the reasons stated herein, Gladstein's motion for summary judgment is DENIED. Lincoln's motion for summary judgment is GRANTED with respect to the following:

1. Lincoln's acceptance of the annotated $90,000 check Gladstein submitted as offset for the SSDI payments she received does not constitute full accord and satisfaction. Gladstein remains obligated to repay the full amount of any overpayments she incurred.

2. The SSDI benefits awarded to Gladstein's daughter are included in "Other Income," as defined in the Policy, and they must be included in the calculation of the overpayment which Gladstein incurred.

3. Lincoln is authorized to reduce LTD benefit payments awarded to Gladstein until full reimbursement of the overpaid amounts were made.

Further, Lincoln's claim for unjust enrichment is DISMISSED as moot. Gladstein's motion to amend her Complaint is DENIED for the reasons stated herein.

With respect to Lincoln's request for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) asserted in Count VI of its counterclaim, Lincoln, as the prevailing party in this litigation, is directed,

if it so chooses, to file a motion for attorney's fees within fourteen (14) days of issuance of this Memorandum and Order. Gladstein may file a response within fourteen (14) days thereafter.


SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
United States District Judge

September 22, 2015